# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-BR-00382-SCT

*JOE GREGORY STEWART*

*v.*

*THE MISSISSIPPI BAR*

ATTORNEY FOR PETITIONER:    MICHAEL CLAYTON BAREFIELD
ATTORNEYS FOR RESPONDENT:    ADAM BRADLEY KILGORE
    MELISSA SELMAN SCOTT
NATURE OF THE CASE:    CIVIL - BAR MATTERS
DISPOSITION:    REINSTATEMENT DENIED - 04/06/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.    Before the Court is Joe Gregory Stewart's fourth petition for reinstatement to the practice of law following his disbarment in 2004. After a thorough review of the record, this Court finds that Stewart has failed to meet the jurisdictional requirements for reinstatement and has not met his burden of proving that he has rehabilitated his conduct and moral character. Accordingly, Stewart's fourth petition for reinstatement is denied.

## FACTS & PROCEDURAL HISTORY

¶2.    The facts leading to Stewart's disbarment are set out in this Court's opinion in *Stewart v. Mississippi Bar*:

> [On May 30, 2003,] Stewart pleaded guilty to one count of conspiracy to commit extortion under color of official right in the United States District Court for the Northern District of Mississippi. *See **United States v. Stewart***, No. 2:03CR00048-001 (N.D. Miss. 2004). This felony charge was made against him for engaging in a pattern of paying Ferrell Hunter, a Tunica

County Sheriff's deputy who cited Stewart's clients for driving under the influence (DUI), to intentionally absent himself from the justice court proceedings on the DUI citations. Hunter's absence resulted in the dismissal of the cases against Stewart's clients. Stewart testified he self-reported this illegal activity to the Federal Bureau of Investigation.[1] He was sentenced to serve three years on probation and to pay a $20,000 fine and a $100 special assessment. The probation term ended March 3, 2007.

*Stewart v. Miss. Bar (Stewart II)*, 5 So. 3d 344, 346 (Miss. 2008) (footnote omitted).

Following Stewart's guilty plea, the Mississippi Bar filed a complaint recommending that Stewart be disbarred. *Id.* Stewart did not respond to the Bar's complaint. *Id.* On September 1, 2004, this Court disbarred Stewart, finding that his crime "[wa]s the type of crime contemplated by Rule 6 of the Rules of Discipline, in that the crime is a felony which warrants the imposition of disbarment." *Miss. Bar v. Stewart (Stewart I)*, 890 So. 2d 900, 900 (Miss. 2004).

¶3. Stewart filed his first petition for reinstatement on January 22, 2008. *Stewart II*, 5 So. 3d at 346. The Bar opposed Stewart's petition, arguing that Stewart had committed too serious an offense to be considered for reinstatement.[2] *Id.* at 350. After reviewing the evidence presented by Stewart, this Court concluded that, "[d]ue to the seriousness of his offense, . . . the civic, church, and charitable involvement offered by Stewart lacked

---

[1] Stewart "did not approach the FBI until after a chance encounter in Oxford with attorney Gail Thompson, who told him that she was representing the Chief Deputy Sheriff from Tunica, who was in trouble with the FBI. Stewart did not self-report his conduct to the Mississippi Bar." *Stewart v. Miss. Bar (Stewart IV)*, 326 So. 3d 388, 389 n.1.

[2] The Bar noted that Stewart's "expressed desire to enter the military should he be readmitted [was] admirable . . . ." *Stewart II*, 5 So. 3d at 346. But the record later showed that Stewart had enlisted in the United States Marine Corps but was discharged and was "not allowed to participate in the commissioning ceremony." *Stewart v. Miss. Bar (Stewart III)*, 84 So. 3d 9, 17 (Miss. 2011).

2

sufficient substance to clearly show a fundamental change in his character." *Stewart II*, 5 So. 3d at 352. Accordingly, this Court denied Stewart's first reinstatement petition. *Id.*

¶4. Stewart filed a second petition for reinstatement on December 11, 2009. *Stewart III*, 84 So. 3d at 11. The Bar again opposed Stewart's reinstatement, asserting that Stewart had been untruthful and misleading during the Bar's investigation of his petition. *Id.* at 11. This Court found that Stewart had not been forthcoming to the Bar about a prior conviction that had been expunged from his record and that he had not cooperated with the Bar in its investigation of the expungement. *Id.* at 20. As a result, the Court denied Stewart's second petition. *Id.*

¶5. On November 7, 2017, Stewart filed his third petition for reinstatement. *Stewart IV*, 326 So. 3d at 390. The Bar opposed Stewart's reinstatement, stating "that Stewart's misconduct was too damaging to the structure of the legal system to allow him to return to the practice of law." *Id.*

¶6. On September 13, 2018, this Court, "ordered Stewart to produce additional documentation to the Bar for its review and further investigation." *Id.* "Upon completion of its duties, the Bar was ordered to file an amended answer, as well as all documents obtained, reviewed, and considered."[3] *Stewart IV*, 326 So. 3d at 390. Stewart delivered the documents to the Bar as ordered by the Court. *Id.* The Bar later filed its amended answer, along with the requested documentation. *Id.*

¶7. On July 25, 2019, this Court denied Stewart's third petition for reinstatement to the

---

[3] The Order, filed September 13, 2018, was entered by then-Presiding Justice Randolph. Order, *Stewart v. Miss. Bar*, No. 2017-BR-01553-SCT (Miss. Sept. 13, 2018).

practice of law, finding that "Stewart ha[d] not met the jurisdictional requirements of Rule 12 [of the Rules of Discipline for the Mississippi State Bar] and ha[d] not provided clear and convincing evidence of his rehabilitation in conduct and character to convince a reasonable person that he has been reformed." *Id.* at 400. Approximately three years later, on April 20, 2022, Stewart filed the current petition.[4]

## STANDARD OF REVIEW

¶8. This Court has exclusive jurisdiction over attorney-reinstatement cases. ***In re Morrison***, 819 So. 2d 1181, 1183 (Miss. 2001). This Court conducts a de novo review of the evidence in such cases, acting as the trier of fact on a case-by-case basis. ***Id.*** The petitioner "carries the burden of proving that he has rehabilitated himself and has established the requisite moral character to entitle him to the privilege of practicing law." ***Stewart II***, 5 So. 3d at 346-47 (citing ***In re Holleman***, 826 So. 2d 1243, 1246 (Miss. 2002)). The standard of proof in reinstatement cases is clear and convincing evidence. ***Wong v. Miss. Bar***, 5 So. 3d 369, 371 (Miss. 2008).

## DISCUSSION

¶9. The fundamental issue in a reinstatement case is whether the petitioner has rehabilitated himself in conduct and character since the disbarment. ***In re Benson***, 890 So. 2d 888, 890 (Miss. 2004). The petitioner demonstrates such rehabilitation "by meeting the jurisdictional requirements of Rule 12 [of the Rules of Discipline for the Mississippi State Bar]." ***Id.*** In ***Benson***, this Court set forth five jurisdictional requirements that apply to Rule

---

[4] Stewart's petition for reinstatement appears as an open motion on the Court's docket. This opinion resolves the pending motion.

4

12 reinstatement petitions. *Id.* The petitioner must:

> (1) state the cause or causes for suspension or disbarment; (2) give the name and current address of all persons, parties, firms, or legal entities who suffered pecuniary loss due to the improper conduct; (3) make full amends and restitution; (4) show that he has the necessary moral character for the practice of law; and (5) demonstrate the requisite legal education to be reinstated to the privilege of practicing law.

*Id.* "Though not a jurisdictional requirement, we consider the Bar's position as to reinstatement as a factor in determining whether to grant the petition." *Id.* (citing *In re Holleman*, 826 So. 2d at 1248).

¶10. As in *Stewart IV*, this Court separately addresses each jurisdictional requirement, but we do so out of order. *Stewart IV*, 326 So. 3d at 391. "The fourth requirement, whether Stewart has shown the necessary moral character for the practice of law, will be addressed last, because it is the most critical factor at issue in Stewart's petition." *Id.*

*I. Cause for Disbarment*

¶11. Stewart was disbarred after he pleaded guilty to one count of conspiracy to commit extortion under color of official right. *Stewart I*, 890 So. 2d at 900. This Court found that Stewart's crime was one that warranted disbarment under Rule 6(a) of the Rules of Discipline for the Mississippi State Bar. *Id.*

¶12. In his petition, Stewart acknowledges he was disbarred after he pleaded guilty in federal court to one count of conspiracy to commit extortion under color of official right. But according to Stewart, the federal prosecution "was more about a matter from 1983[.]" He explains:

> In 1998, Petitioner had paid Ferrell Hunter, a Tunica County Sheriff[']s deputy

who had given citations to Stewart's clients for driving under the influence (DUI). Hunter was paid $100.00 per case by Petitioner to absent himself from the Justice Court proceedings which resulted in the dismissal of the cases against Stewart's clients. This occurred six times and after further contemplation of the impropriety of these actions, Petitioner self-reported his actions to the U.S. Attorney's office.[5] After 5 years, the FBI contacted Petitioner, and advised him that the case would be pursued. Stewart returned to the U.S. Attorney offices and met with John Hailman, Chad Lamar, and Curtis Ivy, who had authority in the matter as the Chief Prosecutor of the District office, Deputy prosecutor, and prosecutor, respectively. *At some point in the conversation Hailman had asked Stewart if it were true that he had a run-in with the law before. Stewart assumed that the only person in the room that would remember it was Chad Lamar, who had graduated with Stewart from the same high school class, and attended Ole Miss at the same time of Stewart's trouble from 1983. Stewart was surprised that it was mentioned.* At the conclusion of that meeting, and after several departures from the room, Hailman set forth that Stewart would be supervised by the U.S. Attorney's office for a period, and that the charges would not be pursued. Hailman's earlier repeated departures from the room were, at the time, curious to Stewart as Jim Greenlee the U.S. Attorney for the Northern District was the only person in the building that outranked Hailman, and anyone else assigned was in the room, at the table. Hailman set forth that Curtis Ivy would be assigned to Stewart, and Chad Lamar would be Ivy's supervisor. Stewart left the office and returned to work. After several weeks Ivy contacted Stewart by cell phone and advised him that the deal was no longer going to work, and gave no explanation. At that point Stewart contacted David Bell, an attorney in Oxford for representation. *At some point in conversation with his attorney, David Bell revealed that Ivy had told him that the prosecution was more about a matter from 1983, that "Stewart had gotten away with"* and that no one officially assigned the case was comfortable with it. However, if Stewart were to plead to the conspiracy charge the U.S. Attorney's office was prepared to keep the plea on information under seal, and the entire file sealed, allowing Stewart precious time to rearrange his life. True to their word, Stewart was allowed to plead guilty remotely, away from Oxford, at the Federal courthouse in Aberdeen, and the file was immediately sealed. In the following months Stewart was able to rearrange his life in hopes of sparing his blameless wife and young children the stigma of his coming disgrace. The sentencing guidelines at the time, without a motion for a "downward departure," would

---

[5] As previously noted, Stewart self-reported after he learned that Tunica's chief deputy sheriff was being investigated by the federal government. **Stewart IV**, 326 So. 3d at 389 n.1.

have had Stewart getting as much as 5 years in the Federal Penitentiary and a $250,000.00 fine. The assigned members of the U.S. Attorney's office were fine with a downward departure, but Stewart (not his attorney) received a phone call one afternoon, from the U.S. Attorney's office carefully explaining the steps Stewart "better get done" so that the motion could be agreed to. *Clearly, there was a battle being waged in the U. S. Attorney's office, over the severity of Stewart's impending punishment and disgrace.*

(Emphasis added.)

¶13.    In response, the Bar asserts that "while technically setting forth the reasons for his disbarment, Mr. Stewart does not seem to take responsibility for his actions that led to his disbarment instead focusing on his interaction with the U.S. Attorney's office." This Court agrees. While Stewart sets forth the reasons for his disbarment, he fails to take full responsibility for his actions that led to his disbarment.

*II.     Names and Addresses of Those Who Suffered Pecuniary Loss*

¶14.    Stewart asserts that no person, party, firm, or legal entity suffered any pecuniary loss as the result of his misconduct. The Bar does not contest this assertion. We find that Stewart has satisfied this requirement.

*III.    Full Amends and Restitution*

¶15.    Stewart asserts that he has made full amends and restitution for his misconduct. The Bar does not contest his assertion. In ***Stewart III***, this Court found that Stewart had made full amends and restitution "[b]ecause [he] ha[d] paid all of the fines and costs he owe[d.]" ***Stewart III***, 84 So. 3d at 13. Accordingly, we find Stewart has satisfied this requirement.

*IV.    Requisite Legal Education*

¶16.    Stewart asserts that he continues to read *summaries* of the opinions handed down by

7

this Court and the Court of Appeals. But a summary is a condensed version of the opinion. A summary does not contain the details of the case or the details of the Court's analysis. While reading summaries of new opinions has been accepted by this Court, *see* ***Ogletree v. Mississippi Bar***, 269 So. 3d 102, 106 (Miss. 2018), reading the opinions in their entirety is expected.

¶17. Stewart further asserts that since his third petition, he has attended several continuing legal education seminars including the 2019 and 2020 summary of recent Mississippi law and the 2018 and 2019 bankruptcy conference. In addition, Stewart participated in a Mississippi bar examination preparation course, and he took the Multi-State Professional Responsibility Exam and received a scaled score consistent with the rules for admission to the Mississippi Bar. Stewart acknowledges in his petition that if reinstated to the practice of law, he will be required to take and pass the Mississippi Bar Exam. *See* Miss. R. Discipline 12.5.

¶18. The Bar asserts that Stewart has met the requirement of requisite legal education. We agree and find that Stewart has satisfied this requirement.

V.    *Requisite Moral Character*

¶19. Of greatest concern to the Bar and this Court is whether Stewart possesses the necessary moral character for the practice of law. We find that Stewart fails to meet this jurisdictional requirement.

A.    ***Stewart III***

¶20. Despite acknowledging that "[a]ll of this is now water under the bridge," Stewart continues to address the expungement issue in ***Stewart III***. Specifically, Stewart addresses

8

what he refers to as a furious sabotage against him.

¶21.     Regarding his moral character, Stewart asserts that former assistant United States attorney Bob Norman and former Mississippi Supreme Court Justice Kay Cobb "furiously sabotag[ed]" him and his efforts to pursue his goal of military service. Stewart asserts that Norman and Cobb each sent a letter to the Mississippi Bar regarding Stewart's prior conviction from 1983 that had been expunged from his record. According to Stewart, the letters contained confidential material, and "no action by the Bar was ever taken to address the divulging of" the information. Moreover, Stewart asserts that but for their "strenuous, and oddly personal opposition," his goal of military service "would have been obtained" and he "would have gone about his life as a Marine Corps officer."

¶22.     Stewart further asserts Norman had a "40-year obsession" with him "to ratchet up the Stewart penalties whenever and wherever possible[.]" Stewart claims that "but for [Norman's] active prosecutorial miscount," Stewart would not have been prosecuted for his 1998 offenses, the offenses that led to his disbarment. Specifically, Stewart asserts:

> The seriousness of the Norman obsession and Norman's bird dogging of the case unassigned to him (on purpose) was made better known when Stewart, not his attorney, received an unsolicited phone call from the U.S. Attorney['s] office in July 2003 advising him to do certain things so that the motion for a downward departure before the court would be granted. The suggestion was that there was still a raging debate within the U.S. Attorney['s] office to go along with the downward departure sentencing posture and/or court might be approached not to take the U.S. Attorney['s] own office's (already approved) agreement to not oppose the motion. The petitioner remembers the knot in his stomach following the phone call and considering the personal weight Norman gave to the matter, though unassigned to the case. It would be years later before the reasons were made known to him.
>
> In spite of his official distance from the case, and his own co-worker's

insistence that Norman stay out of the matter, Norman relayed the details of the sealed file to the Memphis television media to amp up the disgrace and provide a perp walk from the sentencing hearing. Hailman, the Chief of Prosecution[,] was embarrassed by the deliberate act, enough to call Stewart and apologize for the matter and to let him know that he had nothing to do with it.

Stewart ends the discussion by stating:

All of this above, related to the copy of the Sentencing Order . . . faxed directly from the U.S. Attorney's office and not the proper Clerk's office was separate, but not apart, and certainly consistent, from the active involvement, in 1987 of Cobb and Norman, to dash any hope Stewart had in 1986 of simply leaving Mississippi to become an officer in the United State Marine Corps, covered in a separate part of this petition.

The question the Bar has never asked of Stewart in Stewart I, II, or III is why Cobb, in general, and Norman, in particular, ever formed the singular obsession with Stewart and why it has persisted.

¶23. There is no evidence to support Stewart's assertion or claim of sabotage. As ***Stewart III*** reflects, both Norman and Cobb simply noted that Stewart had had a prior conviction expunged, something that Stewart previously had denied during his deposition. ***Stewart III***, 84 So. 3d at 13-14. And Stewart's claim of confidentiality also fails because it was addressed and disregarded in ***Stewart III***. ***Id.*** at 14.

### B. ***Stewart IV***

¶24. Stewart previously served as the executive director of Beauvoir, the home and presidential library of Jefferson Davis. ***Stewart IV***, 326 So. 3d at 394. In ***Stewart IV***, this Court found that "documentation provided to the Bar from Beauvoir indicate[d] that Stewart, at times, conducted himself in an unprofessional manner" and that "[c]orrespondence from Beauvoir staff members show[ed] Stewart's sarcastic, offensive, and demeaning management

10

style." ***Id.*** The Court included six examples, identified as "a" through "f," in the opinion. ***Id.*** at 394-95.

¶25. In his petition, Stewart asserts that he "was denied due process in [***Stewart IV***] due to a lack of opportunity to respond to the Bar's submission [of documentation], per the extraordinary September [13],[6] 2018 Order from [this Court] requesting first Stewart, then the Bar, to submit more information." He claims that "even after requesting to see the information[,] the Bar did not submit it to Stewart until well after submitting it to the Court[.]" But while Stewart asserts he was denied an opportunity to respond, the record reflects that Stewart neither moved to strike the documentation nor asked for additional time to respond.

¶26. Stewart devotes much of his petition to addressing the Beauvoir documentation discussed in ***Stewart IV***. We address each example and/or issue from ***Stewart IV***:

> 1. *Stewart's Work Conduct*
>
> a. *Stewart's Dismissal of the Events Coordinator*

¶27. In ***Stewart IV***, this Court cited the following:

> May 9, 2014 complaint from the chairman of the board of trustees of the Personnel Committee regarding Stewart's dismissal of the events coordinator. The chairman notes that he attempted to discuss the situation with Stewart. Stewart advised that he did not like the events coordinator's attire and "wanted to talk to [the events coordinator]'s husband about the way [she] dresse[d]," stating that "[the events coordinator]'s husband . . . would have to make sure she was dressed properly." The chairman notes the demeaning nature of such a statement and questions whether "any member of this committee [would] let another man tell you that you will have to make sure that before you[r] wife

---

[6] Stewart mistakenly lists September 9, 2018, as the date the order was entered and filed. But, as previously noted, the order was entered and filed on September 13, 2018.

leaves for work . . . she is dressed properly."

*Id.* at 394 (alterations in original).  In response, Stewart admits that he spoke with the

employee regarding her attire, but he asserts:

> the concern over the improper and revealing attire was not Stewart's alone, and had been taking place well before his arrival. Beauvoir is an historical structure representing a moment in time. Stewart required the employees to dress, as comfortably as possible, in period dress. The Events Coordinator, under the assumed protection of the Chairman of the Personnel Committee, refused to tone down her provocative attire that was inappropriate, even jarring at times, and Stewart did nothing wrong in calling it to her attention. In fact, he was doing his job.

### b.     Unhealthy Work Environment Under Stewart

¶28.   In *Stewart IV*, this Court noted as follows:

> March 1, 2016 letter of resignation from Dennie Britton Spence who claimed Stewart "repeatedly and publically demeaned and criticized workers . . . in a manner unbefitting the work place." Spence concluded that the work environment under Stewart was not "healthy."

*Id.* at 395 (alteration in original).   In response, Stewart first asserts that the letter of

resignation from Spence was "taken from the personnel files without the knowledge or

consent of [Spence] or the Board of Beauvoir[.]"  He further asserts that it was Spence who

created an unhealthy work environment and that Spence "was particularly insubordinate to

a degree most management would not tolerate, but Stewart did."  Moreover, Stewart asserts

that the referenced letter of resignation failed "to provide any specifics of conduct or

behavior of [Stewart] that would adversely affect his character and fitness to practice law."

### c.     Stewart's Hiring Practices

¶29.   In *Stewart IV*, the Court noted the

12

May 24, 2016 letter of resignation from [DG,] the facilities manager[,] in which he stated that he would not wish the last six months of his employment on his worst enemy. The letter includes a "synopsis of issues with . . . Stewart" and references Stewart's poor hiring and management decisions. Of significance, in August 2014, Stewart hired Leroy Waller, a convicted felon, as his assistant director. In November 2016, a member of the Sons of Confederate Veterans brought charges against Waller due to his convicted felon status.

*Id.* (second and third alterations in original). In response, Stewart asserts he did not hire Waller. Stewart explains that Waller is the father-in-law of DG, a "disgruntled" former employee of Beauvoir. According to Stewart, DG had much animosity towards Waller and attempted to have him "formally booted from the Sons of Confederate Veterans, a cause that ultimately failed, which is why DG resigned." Stewart claims that DG's resignation "coincide[d] with his loss of that political fight with his own father-in-law, and he viewed Stewart as the chief reason for that loss, which . . . is not true."

*d.*      *Stewart's Email Critique of Beauvoir's Garden*

¶30. In *Stewart IV*, this Court noted a

May 22, 2016 email from Stewart to Beauvoir's director of development and programs regarding Beauvoir's garden in which Stewart refers to the garden as "an abomination" and "ugly and awful."

*Id.* In response, Stewart asserts that "[c]onsidering . . . the recipient of his email was a chain smoking, former discount beer and cigarette store clerk, who openly bragged about shooting a man dead in California, before moving to Mississippi, [he] felt like plain language would be better understood." He explains that his concern over the garden was based on Beauvoir's receipt of a $480,000 grant that required the property to be properly maintained.

*e.*      *Stewart's Email Critique Regarding the Bricks for*

13

*Beauvoir Program*

¶31.    In ***Stewart IV***, the Court referenced an "August 21, 2017 email from Stewart to Beauvoir's director of development and programs regarding the 'Bricks for Beauvoir project' in which Stewart advise[d] that 'they need to get the font exactly the same or the Walkway will look like s**t.'" ***Id.***  In response, Stewart criticizes Beauvoir's former legal counsel and explains that "[n]ot only [we]re the bricks placed during [former legal counsel]'s tenure the wrong size but the font is smeared and illegible[.]" Stewart claims that after Beauvoir's former legal counsel resigned, "the Board had to have all of his poorly made bricks removed and redone for a uniform look."

> f.    *Stewart's Email Referencing Beauvoir's Former Legal Counsel*

¶32.    In ***Stewart IV***, this Court referenced a "January 24, 2018 email from Stewart to Beauvoir's director of development and programs regarding the 'Bricks for Beauvoir project'" in which Stewart stated:

> "There is an Executive Council meeting this Saturday where I expect the subject to come up and some kind of accounting.  If I don't have anything from Beauvoir . . . then the members will only have their imaginations.  If Dr. Payne[,] [Beauvoir's former legal counsel,] has another tummy ache and doesn't come . . . I have no information to head off any wild conjecture."

***Id.*** (first, second, and fourth alterations in original).  Stewart, in response, asserts that it was very well known that Beauvoir's former legal counsel "had a strong dislike for [him]." Stewart claims that nothing in this email reflects adversely his moral character, and he defends his actions by stating, "some people don't know or don't have to deal with situations like this."

¶33. Notably, on multiple occasions in his petition, Stewart defends his actions by stating that nothing about the above-referenced conduct adversely affects his moral character. But while one example, standing alone, might not reflect an adverse moral character, several instances of unprofessionalism does adversely reflect moral character.

### 2. Stewart's Felony Status

¶34. In **Stewart IV**, in addition to the six examples discussed above, the Court found as follows:

> Further documentation indicate[d] Stewart's disregard not only of Beauvoir's best interests, but also his disregard of the law. In 2014, an examiner with the Charities Division of the Mississippi Secretary of State's Office advised Stewart that due to his prior felony conviction, he could be employed by Beauvoir but could not have access to or control of the organization's funds. Despite this information and knowledge of same, Stewart continued to have access to or control of Beauvoir's charitable funds.

> In a February 2017 examination summary report, the Charities Division found that during Stewart's tenure as executive director at Beauvoir, Stewart had "access to charity funds and signed checks on multiple accounts." The senior examiner noted that despite "several conversations with [Stewart] . . . during which time [she] addressed [his] felony conviction and [his] role with Beauvoir," Stewart continued to access or control Beauvoir's funds in violation of Mississippi Code Section 79-11-509(1)(f) (Rev. 2013). As a result, the senior examiner advised that the Secretary of State's Office *could* deny, suspend, or revoke Beauvoir's charity under Section 79-11-509(1)(f).

> Approximately one year later, in January 2018, Beauvoir's counsel informed the Board that Stewart, who was working on the "Bricks for Beauvoir project," had requested a check for $3,100 in order to pay the brick engraver. Beauvoir's counsel advised that due to Stewart's status as a convicted felon, Stewart was unable to have any influence over, handle, or have access to the charitable funds. In Beauvoir's counsel's opinion, Stewart's "choosing of the [brick] engraver and demand for payment [we]re clearly in violation of [Section 79-11-509(1)(f)] and *could* result in revocation of [Beauvoir's] charity's registration." As a result, Beauvoir's counsel informed the Board that he would not be answering any of Stewart's correspondence or

demands for payment.

> Additionally, Beauvoir's counsel noted that Stewart's "emails ha[d] become increasingly sarcastic and inappropriate for a . . . staff member of the E[xecutive] C[ommittee]" and requested that Stewart be counseled "to cease his harassment and abuse of the staff at Beauvoir."

*Id.* at 395-96 (alterations in original) (emphasis added).

¶35. Under Mississippi Code Section 79-11-509(1)(f),

> The Secretary of State *shall* deny, suspend or revoke a registration or an exemption for . . . [a]ny applicant, registrant, officer, director, or partner of the applicant or registrant, or any agent or employee thereof who has been convicted of a felony or a misdemeanor involving misrepresentation, misapplication or misuse of the money or property of another maintains a position where he or she has access to or control over the funds of the charitable organization.

Miss. Code. Ann. § 79-11-509(1)(f) (Rev. 2013) (emphasis added).

¶36. Stewart asserts Section 79-11-509(1)(f) does not apply to him. He further asserts the statute was misquoted, stating, "the statute was mistakenly quoted to say 'could' be suspended or revoked.'" Stewart explains:

> According to the first day of Criminal Law in every law school anywhere, "shall" means shall, "may" means may. Application of the penalties in that provision would have required a suspension or revocation of Beauvoir's status, and none ever came forth, related to Stewart, precisely because the Secretary of State's office knew that the statute could not apply. The misquote, instead of the simple words of the statute, invited an erroneous conclusion that Stewart was in violation of the statute.

¶37. But as *Stewart IV* makes clear, this Court did not misquote Section 79-11-509(1)(f). Instead, this Court referenced and quoted from the records and documents submitted by the Bar. According to those records and documents, a senior examiner with the Secretary of State's Office's Charities Division advised that the Secretary of State's Office could deny,

16

suspend, or revoke Beauvoir's charity under Section 79-11-509(1)(f) based on Stewart's "access to charity funds" and his "felony conviction and [his] role with Beauvoir." ***Stewart IV***, 326 So. 3d at 395 (alteration in original) (internal quotation marks omitted). And Beauvoir's former legal counsel advised that Stewart's "choosing of the [brick] engraver and demand for payment . . . could result in revocation of [Beauvoir's] charity's registration." *Id.* at 396 (first and third alterations in original) (internal quotation marks omitted).

¶38. According to Stewart, the fact that the Secretary of State's Office did not revoke Beauvoir's charity's registration shows that Section 79-11-509(1)(f) is inapplicable. Specifically, Stewart claims:

> If [his] felony had fit within the language of the statute, then the unavoidable conclusion would have been a suspension or revocation of the non-profit status of Beauvoir, if even for one hour of one day. But, because the statute did not apply to [his] felony, the penalty wasn't applied to Beauvoir[.]

¶39. But simply because the Secretary of State's Office did not revoke Beauvoir's charity's registration does not mean the statute is inapplicable. Regardless, Stewart misses the point. The point is not whether the statute is applicable or whether Stewart violated the statute. The point is that Stewart disregarded the Secretary of State's Office's and Beauvoir's counsel's concern that he was in violation of the statute and that Beauvoir's registration could be affected as a result of his actions. It was this disregard that demonstrated adverse moral character.

¶40. Stewart further asserts his felony status was never brought up or discussed with the senior examiner in 2014. He claims that despite his request, the Secretary of State's Office has failed to provide him any documentation from 2014 that would support the senior

examiner's recollection. As a result, Stewart denies that it happened. He admits, however, that his felony status was discussed in late 2016, but he asserts, by way of a letter from a former Beauvoir board member,[7] that the investigation was motivated by members of Beauvoir who were upset over his use of Beauvoir property. In other words, despite the above-referenced documentation, Stewart suggests that his felony status was not so much of a concern with the Secretary of State's Office but rather with Beauvoir and that the concern about his felony status was unrelated to the nature of his conviction (i.e., conspiracy to commit extortion) but, instead, was motivated by certain people's dislike of him.

¶41. Stewart also asserts that because his federal conviction involved a conspiracy charge, Section 79-11-509(1)(f) does not apply. According to Stewart, "we know this because there is currently more than one felon running the financial affairs of Mississippi non-profits, felons who pled to the exact same conspiracy charge that [he] did[.]" But again, the point is not whether the statute applies. The Secretary of State's Office voiced concern regarding Stewart's access to charitable funds based on the nature of his conviction. The fact that Stewart disregarded this concern and continued to put himself in a position to access or control charitable funds in potential contradiction of Beauvoir's best interests evidences adverse moral character.[8]

---

[7] The letter was written by Dr. Christopher J.M. Cummins, who was on the board at Beauvoir during Stewart's tenure.

[8] There is nothing in the record to suggest that after the Secretary of State's Office voiced its concern over Stewart's felony status, Stewart inquired as to whether he was in violation of Section 79-11-509(1)(f) or confirmed with Beauvoir as to whether it wanted him to continue having access to and/or control over charitable funds.

### 3. Stewart's Social Media Posts

¶42. In ***Stewart IV***, this Court further found that "Stewart's social media posts also evince[d] a disregard for Beauvoir's best interests." ***Id.*** at 396. The Court explained:

> In 2017, the director of development and programs at Beauvoir notified the board members that Beauvoir had received a message on its Facebook page regarding Stewart. Specifically, the Board was advised as follows:
>
> > Gentlemen:
> >
> > There is a page on Face Book that is set up for people who don't like President Trump. The creator of the page[,] Amy Schenkemeyer, sent us a message with screen shots of a conversation she had with Greg Stewart. From his post to her[,] she accessed his Face Book page. Which is the reason why we received her message. From his page[,] she noticed his affiliation with Beauvoir. If she decides to make [the conversation] public, Beauvoir will suffer. At this point[,] the conversation has not been made public.
>
> The conversation between Stewart and Schenkemeyer was attached to the email. Throughout the conversation, Stewart uses profanity and offensive language, including racist and discriminatory language.

***Id.*** (footnote omitted). Footnote 5 noted that "Stewart repeatedly refers to Schenkemeyer as a 'dumb c\*\*t' as well as a 'b\*\*\*h' and a 'whore' and states that Schenkemeyer can 'go suck that Mexican d\*\*k.'" ***Id.*** n.5.

¶43. In response, Stewart denies having the conversation with Schenkemeyer on Facebook. He explains that someone must have hacked into his computer. He includes statements from Beauvoir employees that seemingly accuse Beauvoir's former legal counsel of hacking into a former employee's computer. According to Stewart, the offensive Facebook post occurred at the height of Beauvoir's former legal counsel's anger with Stewart over the Bricks for

Beauvoir project. Stewart suggests that Beauvoir's former legal counsel hacked into his computer and posted the offensive comments in an "effort to sabotage" his petition for reinstatement.

¶44. But not only would someone have had to hack into Stewart's computer, he or she would also have had to hack into or access Stewart's Facebook account, to search for the Facebook page regarding President Trump, and then to post the offensive comments. Also, nothing guaranteed that Beauvoir would learn about the offensive posts. It took Schenkemeyer's finding and accessing Stewart's Facebook page and then contacting Beauvoir for Beauvoir to learn of the posts. While Stewart's hacking allegation is possible, it seems that if someone wanted to sabotage Stewart via social media, there were much easier options, options that would have guaranteed to bring to light the offensive conduct to be used against Stewart. Moreover, although Stewart denies the offensive posts, the record reflects Stewart's tendency to use derogatory and demeaning language.

### C. Employment Since Disbarment

¶45. Stewart previously owned and managed a Holiday Inn and a UPS store on the Mississippi Gulf Coast. He also previously owned three buildings that were leased to Wendy's operators.

¶46. At present, Stewart owns a building on Highway 49 near downtown Gulfport that is leased by a nationwide electrical supply company. He also owns a storage facility in Jackson County. Additionally, Stewart serves as a poll worker and a poll watcher during elections.

### D. Civic, Church, and Charitable Involvement

20

¶47. In his petition, Stewart asserts that he "has essentially carried on his charitable work and community involvement at the same level he always has, as discussed in the previous three petitions." That charitable work includes Stewart's service with the Boy Scouts of America where he has served as Scout Master, Unit Commissioner, and District Commissioner of the Spanish Trail Scout District. He also received the Silver Beaver Award in 2016, the highest honor available to adult volunteers. Additionally, Stewart served as a board member and risk manager of the Children's International Summer Villages, and he assisted in fundraising for the TNT Ranch Recovery Home in Gulfport.

¶48. Stewart asserts that since the filing of his third petition, he has engaged in the following charitable activities:

> (1) Humphries County Courthouse Renovation Project; (2) Lobbying for antiquities legislation in the Legislature; (3) Commissioned puzzles made from artwork for the benefit of Beauvoir ($1,000); (4) Continued to work every election as a Poll Worker, made political contributions to candidates, actively participated in Harrison County Republican Club activities; (5) Within Boy Scouts: (a) sponsored, annually for the last six years, a $1,000 table at the District Banquet for Boy Scouts; (b) serve as Committee Chairman of Troop 301; (c) serve as Committee Chairman of Pack 301; (d) serve as the Spanish Trail District Camping Coordinator; (6) Kept up with continuing legal education, as follows: (a) attended 2019 and 2020 Summary of Recent Mississippi Law; (b) attended the Bankruptcy Conference in 2018 & 2019; (c) took the 2 month long Bar-Bri Bar Examination (for Mississippi ) course May & June of 2019; (7) Continued to Serve Trinity UM Church as a van driver; and (8) Sponsor for the Junior Auxiliary annual fundraiser ($1,000.00).

### E. Letters of Support

¶49. In *Stewart IV*, Stewart provided thirty-seven letters of recommendation in support of his petition. *Stewart IV*, 326 So. 3d at 397. Stewart did not include any letters of support with this petition. But as the Bar noted, some of the documentation in Stewart's exhibits

could qualify as recommendations.

¶50. In September 2022, Stewart supplemented his petition with five letters of support, one from a Methodist minister and four from attorneys.[9] Each letter discusses Stewart's community service and involvement.

¶51. The Bar published notice of Stewart's petition to the Mississippi Bar members and asked for letters in support of or in opposition to Stewart's reinstatement. The Bar received one letter in opposition.[10] That letter, submitted by an attorney in Gulfport, stated in part:

> I wish to voice my opposition to the most recent Petition for Reinstatement by Mr. Stewart. I do not believe I personally know Mr. Stewart, however in my opinion paying a witness not to appear in court so you can procure a dismissal for your client on multiple occasions is about as bad as it can be for a member of the Bar. Those are such egregious violations, I do not believe Mr. Stewart should be reinstated to the practice of law under any circumstances. I also read Mr. Stewart's Petition [and] note his attempt to deflect from his conduct by blaming others demonstrates he should not be reinstated[.]

### F. Mental and Emotional Status

¶52. According to the Bar, Stewart "appeared to be mentally and emotionally stable during the deposition." During his deposition, Stewart indicated that he was in good health, that he does not use illegal drugs, and that he has stopped consuming alcohol since his last petition.

### G. Future Plans

¶53. During his deposition, Stewart testified that if reinstated, he would like to practice bankruptcy law. He explained:

---

[9] The letters of recommendation are from Rev. Dr. John M. McCay, III, William B. Weatherly, Richard A. Rozanski, James Bailey Halliday, Sr., and Jason R. Savarese.

[10] The letter in opposition was submitted by attorney Tim C. Holleman.

According to y'all's statistics, the least amount of Bar complaints come in bankruptcy. That's also where desperate people who are already beat up show up. It's not like I need the money. So, you know, maxing out on the allowable charge is not something that I need to do. What I'd rather do is Chapter 13 and Chapter 7. And 7 is better than 13 for that person. Do that and then make—you know, charge when you need to. But probably not, you know, going to take—don't charge so much because they're already beat down. That would be a good place for me.

If his petition is denied, Stewart testified that he will continue to remain active in his community.

## ANALYSIS AND DECISION

¶54.    "Attorney-reinstatement cases are judged on a case-by-case basis in order to account for the unique circumstances of each petitioner." *Stewart IV*, 326 So. 3d at 398. "This Court has previously granted petitions for reinstatement filed by attorneys like Stewart who were disbarred for committing serious felony offenses." *Id.*

¶55.    For example, in *Mississippi Bar v. McGuire*, Jimmy D. McGuire was disbarred by this Court in 1997 following his felony conviction in federal court for filing a false currency reporting form in violation of the Internal Revenue Code. *Miss. Bar v. McGuire (McGuire I)*, 694 So. 2d 674, 674 (Miss. 1997). McGuire "was taped conspiring with purported drug trafficking clients (who were actually undercover agents) to accept cash payments in a manner shielding the source and purpose of the cash in violation of federal law." *McGuire v. Miss. Bar (McGuire II)*, 798 So. 2d 476, 477 (Miss. 2001). This Court denied McGuire's first two petitions for reinstatement, finding that he had shown no remorse for his misconduct and had provided little or no evidence of his rehabilitation through charitable and civic engagement. *Id.* at 480; *In re McGuire (McGuire III)*, 849 So. 2d 880, 884 (Miss. 2003).

23

¶56. This Court ultimately granted McGuire's third petition for reinstatement, despite expressing disappointment with McGuire's continued attempts to downplay his offense as mere "bad judgment." *In re McGuire (McGuire IV)*, 912 So. 2d 902, 906 (Miss. 2005). This Court found that McGuire was "extremely fortunate[,]" because he would have been ineligible for reinstatement under the amended version of Rule 12.[11] *McGuire IV*, 912 So. 2d at 906.

¶57. In *McGuire IV*, the attorney presented evidence that he was an active member of his church, spent ten to fourteen hours per week doing charitable work, and donated money to various charitable organizations. *Id.* at 904-05. The attorney also submitted sixty-six letters supporting his reinstatement. *Id.* at 905. We previously compared Stewart's case to McGuire's and found that the two offenses were "arguably comparable." *Stewart II*, 5 So. 3d at 350.

¶58. In support of his petition for reinstatement, Stewart relies on *In re Medley*, 687 So. 2d 1219 (Miss. 1997). There, Medley was convicted of "the embezzlement of a $16,000 check from Engel Realty Company, Inc., which was made payable to his former employer, James K. Dukes." *Id.* at 1219. Medley was later disbarred on the basis of his felony conviction. *Id.* When Medley petitioned for reinstatement, this Court noted that its "decision regarding reinstatement must focus on Medley's rehabilitation in conduct and character since

---

[11] Rule 12 was amended in 2002 to provide that an attorney who was disbarred after being convicted of a felony involving "interference with the administration of justice," "extortion," or "an attempt, conspiracy or solicitation of another to commit such a crime, shall be ineligible for reinstatement to the practice of law." Miss. R. Discipline 12(d). This rule, however, applies only to convictions that occurred after April 4, 2002. Miss. R. Discipline 12(d).

disbarment." *Id.* at 1220. The Court found the following in support of Medley's moral

character:

> With his petition, Medley submitted many letters of recommendation for reinstatement based on his moral character. *See Ex Parte Marshall*, 165 Miss. 523, 551, 147 So. 791, 796 (1933) (opinion of those acquainted with individual is admissible evidence of character). After the incident which led to disbarment, Medley was employed at Delmar Industries, a company owned by his sister, and also by several oil companies for the purpose of performing title work. Medley's embezzlement conviction was then affirmed by this Court, and he began serving his ten-year sentence with the Mississippi Department of Corrections facility in Pascagoula. He worked as a clerk assisting in the day-to-day activities of the restitution center, and became involved in several Christian organizations which provided support to inmates and their families. He was transferred to the Harrison County Community Work Center after his first year where he performed work for the Gulfport Police Department in writing their grant proposals, and with the Director of the Gulfport Police Explorer Programs and their summer camp, as well as with several of the Department's fundraising activities. He also was involved with work for the Gulfport City Schools and with adult education programs teaching men to read. Medley also helped Mr. Gerald Gafford, the Inspector General for the Office of the Governor of the State of Mississippi, prepare a report which helped the Governor reap more than one million dollars for the State of Mississippi in the issuance of tax land patents. Based on a report from the State Parole Board, the Governor signed an order effective May 13, 1994, commuting his sentence.
>
> Since his return to Hattiesburg, Mississippi, where he has joint custody of his two boys after a divorce which occurred during his legal troubles, he has been a member of the PTA at both of his boys' schools, a coach for the Hattiesburg Recreation Department and an assistant for his son's soccer team. He is a member of the First Baptist Church in Hattiesburg where he teaches sixth grade Sunday School. He is a member of the Walthall Foundation which works to preserve historical sites, and he has worked with Willmut Gas Company performing non-legal services in negotiating easements and conducting record searches.

*Id.* The Court concluded that based on the evidence presented, "Medley ha[d] demonstrated

the requisite moral character to practice law." *Id.* As a result, Medley's petition for

25

reinstatement to the practice of law was granted "contingent upon his passage of the Mississippi Bar Exam and the Multi-State Professional Responsibility Exam." *Id.*

¶59. Stewart asserts Medley's act of "[e]mbezzling $16,000 from his attorney employer is certainly more egregious than . . . Stewart's underlying conduct." This Court declines to address whether embezzlement is more egregious than extortion or conspiracy to commit extortion. Clearly, both offenses are serious and egregious. But while Medley committed *one* act, Stewart committed *six*. Indeed, Stewart admits that on six separate occasions, he paid a sheriff's deputy $100 "to absent himself from the Justice Court proceedings which resulted in the dismissal of the cases against Stewart's clients." And it is possible that Stewart would have continued to commit further acts had it not been for the "chance encounter in Oxford with attorney Gail Thompson, who told him that she was representing the Chief Deputy Sheriff from Tunica, who was in trouble with the FBI." *Stewart IV*, 326 So. 3d at 389 n.1. Additionally, in *Medley*, neither the Mississippi Bar nor Dukes opposed Medley's petition for reinstatement. *Medley*, 687 So. 2d at 1219. Here, the Mississippi Bar and at least one attorney opposes Stewart's reinstatement.

¶60. This Court previously recognized that Stewart has "made great strides toward rehabilitating his character, and has demonstrated a changed life in many ways." *Stewart III*, 84 So. 3d at 11. And in *Stewart IV*, this Court recognized that Stewart "has acknowledged the severity of his offense and has expressed remorse for his actions." *Stewart IV*, 326 So. 3d at 399-400.[12] But while Stewart acknowledges the severity of his offense, he continues

---

[12] This Court notes that it would be difficult for Stewart not to acknowledge the severity of his offense in light of the 2002 amendment to Rule 12, which would have

to point fingers at others in an attempt to deflect responsibility. As the Bar notes,

> Stewart should not be reinstated to the practice of law based upon his recurring refusal to accept the results of his consequences and actions going back forty years, instead pointing to how others supposedly influenced each situation to in essence make it harder for him or that he was somehow treated unfairly.

¶61. Nowhere in his petition does Stewart assert that he should have exercised better judgment or handled a situation differently. Instead, he makes excuses, blames others, and asserts things such as "[i]f every attorney who used a common curse word was not allowed to become licensed or be reinstated then there would be very few attorneys in the State of Mississippi." In fact, Stewart spends the majority of his petition explaining why this Court erroneously denied his third petition by relying on documents related to Beauvoir. And he even suggests that the federal investigation that led to his disbarment was motivated by Norman and the United States Attorney's Office, not because of his misconduct in 1998 but because of something he did in 1983 that he "had gotten away with."

¶62. Stewart's deflection is incredible. Stewart was disbarred because he paid a witness, not once or twice, but *six* times, "to intentionally absent himself from the justice court proceedings on . . . DUI citations" resulting "in the dismissal of the cases against Stewart's clients." **Stewart II**, 5 So. 3d at 346. Regardless of Norman's and/or the United States Attorney's Office's alleged motivation, Stewart's actions and Stewart's actions alone led to his disbarment. Likewise, Stewart's actions and Stewart's actions alone led to the denial of his prior petitions for reinstatement.

---

disqualified Stewart from reinstatement. *See* Miss. R. Discipline 12(d); *see also* **Stewart III**, 84 So. 3d at 12 (Stewart "is eligible to seek reinstatement based on the rules that were in effect at the time of his offense.").

¶63. "As officers of the Court, [lawyers] are required to behave in accordance to certain high standards." *Miss. Bar v. Lumumba*, 912 So. 2d 871, 883 (Miss. 2005). "It is a privilege to practice law, and the principle here is that [lawyers] give up many rights ordinary citizens have in order to be practicing lawyers." *Id.* "[T]he license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters." *Tucker v. Miss. Bar*, 326 So. 3d 407, 412 (Miss. 2020) (internal quotation marks omitted) (quoting *Anderson v. Miss. Bar*, 269 So. 3d 109, 113 (Miss. 2018)). Stewart has failed to prove by clear and convincing evidence "[a] firm resolve to live a correct life evidenced by outward manifestations sufficient to convince a reasonable mind clearly that the person has reformed . . . ." *Phillips v. Miss. Bar*, 427 So. 2d 1380, 1382 (Miss. 1983) (quoting *Ex parte Marshall*, 165 Miss. 523, 556, 147 So. 791, 798 (1933)). Stewart continues to deny full responsibility for his actions, instead focusing on how others allegedly influenced the outcome and consequences.

¶64. Moreover, Stewart fails to offer any new evidence since his last petition to change our analysis. Indeed, he fails to "give specific reasons justifying reinstatement" or "discuss in detail [his] rehabilitation of the requisite moral character[.]" Miss. R. of Discipline Proc. 12.7. Instead, he continues to make excuses and attack others, based on prior events, some of which occurred forty years ago, in an effort to deflect responsibility. As such, Stewart's fourth petition is denied.

**CONCLUSION**

¶65. This Court finds that Stewart has not met the jurisdictional requirements of Rule 12

and has not provided clear and convincing evidence of his rehabilitation in conduct and character to convince a reasonable person that he has been reformed. Accordingly, Stewart's fourth petition for reinstatement to the practice of law is denied.

¶66. **FOURTH PETITION OF JOE GREGORY STEWART FOR REINSTATEMENT TO THE PRACTICE OF LAW IN THE STATE OF MISSISSIPPI IS DENIED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. MAXWELL AND ISHEE, JJ., NOT PARTICIPATING.**